## THE GEORGIA.[1]

### SEVILLE et al. v. THE GEORGIA.

(District Court, S. D. New York. January 18, 1893.)

1. SALVAGE—FIRE ON VESSEL AT PIER—TOWING AND PUMPING SERVICES.

Fire broke out on a lighter loaded with cotton and lumber, and lying on the New Jersey side of the North river. Signals for assistance being given, a tug took the lighter from the wharf into the stream, where five tugs pumped water on her. By the time of the arrival of the city fire boat, the fire had been brought under control by the tugs. The lighter was afterwards towed by some of the tugs to the Erie basin, and the cargo discharged. The loss on the cotton was about $5,000; the value of the whole cargo, about $12,500, and of the barge, $2,500. The tugs were in attendance on the barge for two or three hours. Held, that $2,000 should be awarded for the whole service.

2. SAME—RIGHT OF OWNER TO DIRECT WHERE PROPERTY TO BE TAKEN.

Where a considerable salvage service has been rendered, the owner of the salved property cannot arbitrarily require it to be taken to a place designated by him, without reference to the convenience or security of the salvors in the enforcement of their claims. Hence, where tugs took a cotton vessel, on fire, out of the jurisdiction of New Jersey, into the waters of the state of New York, and there rendered salvage services, and the insurers of the cotton were also in New York, and the salved property was taken to Erie basin, as is customary with such cargoes, and which is a proper place, held, that the fact that the tugs, when half way to Erie basin, refused to obey the order of the owner of the burning vessel to take her back to New Jersey, would not affect the recovery of salvage.

In Admiralty. Libel by Leah Seville and others, owners of the tug Ellen, against the barge Georgia, for salvage. The owners of other tugs assisting in the service intervene by petition. Decree for libelants and interveners.

Goodrich, Deady & Goodrich, for the Ellen and the Howard.

Wing, Shoudy & Putnam, for the Golden Rod and the Johnson Brothers.

McCarty & Berier, for the Daylight and the McCarty.

Hoadly, Lauterbach & Johnson, for the Georgia.

BROWN, District Judge. The above libel was filed to recover for salvage services rendered by the libelants' steam tug Ellen to the barge Georgia, on which a fire broke out a little after 8 A. M. of June 18, 1892, in some bales of compressed cotton piled some six tiers high upon her deck. On the after part of her deck were 25,000 feet of lumber. The following tugs were admitted by petition to represent their interests as joint salvers: The tug Johnson Brothers, the Golden Rod, the Howard, the Daylight and the tug J. & J. McCarty.

The Georgia was unloading her cotton upon the steamship America, alongside and outside of which she was lying, on the south side of pier ———, at Hoboken. Two streams of water were directed upon her from the America, but they were found insufficient, and the su-

[1] Reported by E. G. Benedict, Esq., of the New York bar.

perintendent of the dock thereupon required the barge to be towed away from the vessel, and out into the stream. Signals were given for help, and the libelants' tug Ellen in a few minutes came alongside and took the barge out into mid-river. A pretty strong northeast wind was blowing, and the barge was kept by the Ellen with the lumber end of the cargo directed towards the wind, the better to protect the lumber from the fire, as well as to diminish the force of the wind upon the flames. The other tugs came in the order above named, in response to continued signals. The last three came at about the same time. The Johnson Brothers came first with her pumps ready about 15 minutes before the Golden Rod; and the latter, about 10 minutes before the Howard. About 5 or 10 minutes after the Howard, the Daylight, and the McCarty had arrived, the city fire boat Zopher Mills appeared. But by this time the flames, which had burst out from about three-fourths of the cotton cargo, had been subdued, though the fire continued smouldering beneath, as is usual in cotton cargoes, until the cotton was unloaded at the Erie basin, where she was taken by the tugs, arriving there about 11 o'clock.

By the time the boats had got down with the ebb tide to somewhere between Chambers street and Rector street, the tug Fuller came alongside, with Mr. Wilson, who was the representative of the owners of the Georgia, and demanded that the tugs should turn back and take the barge to the Savannah pier above Castle point at Hoboken, where the owners had sufficient facilities for a speedy discharge of the cotton. The Erie basin, however, being a customary place for taking cotton cargoes in a smouldering condition, the tugs did not heed his demands, and on arrival at the Erie basin the necessities of immediate unloading forbade towing back to Hoboken; and the cargo was unloaded by 5 o'clock that afternoon. It is claimed that the expenses incurred there in the employment of hands for unloading, and in the repicking and rebailing of the cotton, amounting to $781, would have been saved to the owners, had the cotton been discharged at their own wharf at Hoboken, where they could have used their own facilities and employes. The tugs Howard, Daylight and McCarty were also notified by Mr. Wilson, when they had got down as far as Rector street, that their services were no longer required. The Daylight acquiesced; the Howard and the McCarty did not acquiesce, and the lines of the McCarty were cut, including also those of the Daylight before she had time to unfasten them. I have no doubt that at that time the Mills and the Fuller alone, or the Johnson Brothers and the Golden Rod alone, had sufficient facilities for controlling the fire, it being already under full control, and no blaze anywhere appearing.

The mast and hull of the barge were not injured; nor was the lumber part of the cargo. The loss on the cotton was about $5,000; the value of the whole cargo was about $12,500; and of the barge about $2,500. The value of the Johnson Brothers was about $6,000; that of the Golden Rod and the Daylight about $10,000 each. The various tugs were in attendance on the barge from two to three hours. The most important part of their service was rendered before the Mills and the Fuller arrived. The service of the Johnson Brothers was of most value, because she was the first in attendance able to throw

water on the fire; and her service in playing with her hose was the longest, and was rendered when minutes were most precious.

The case was not one in which there was any practical necessity that the three tugs which were no longer desired, should remain by in order to secure their legal rights, or to protect their interests. The remaining salving tugs were sufficient both to control the fire, and to guard the legal interests of all the salvors; so that the longer attendance of the three tugs ordered off adds nothing to their claims. Under such circumstances they should have desisted when required to do so by the owners' representative. But the cutting of the Daylight's lines was too summary a proceeding.

The Ellen's services were meritorious. Though she was not able to throw water upon the fire, she took the boat out into the stream, and by her signals the other tugs were speedily procured. By keeping the barge in the best position, also, an essential service was rendered.

The question as to the duty of the tugs to take the barge to the owners' dock at Hoboken when directed to do so by Mr. Wilson, on behalf of the owners, is not so simple as it might seem at first. Where a very considerable salvage service has been rendered, as in this case, it is not true that the owner, when he comes on the scene, may arbitrarily require the property to be taken anywhere he may designate, without reference to the convenience, or to the security of the salvors in the enforcement of their claims. In some cases the hull alone is insufficient to pay the salvage award; and then a delivery to the shipowners and a dispersion of cargo wholly or in part without security, would not only involve the salvors in loss, but lead to great difficulty and confusion in the adjustment of the average claims as between the different insurers. Unreasonable conduct on either side is to be condemned. It is a question of circumstances.

In the present case, the barge had been ordered by the dock superintendent to be taken away from alongside the vessel, where she was lying. She was cut loose and thereupon came within "the waters" of this state, and within the jurisdiction of this court; and it was within this jurisdiction that all the salvage services were rendered. The insurers were also here; and it was they who were primarily responsible for the loss, the salvage, and the subsequent expense. The custom to take such cargoes to the Erie basin, necessarily presupposes special facilities there for proper and economical handling, as well as the acquiescence of the insurers therein for their convenience in all that pertains to the handling of the cargo and to the adjustment and payment of the loss. It was to be presumed that this barge and her cargo were insured, as is customary; and in the case of an evident considerable loss, which the insurers presumably must pay, I think the tugs were justified, when already nearly halfway to the Erie basin, and having the benefit of the ebb tide, in continuing to that place, in the presumed interest of the insurers and upon their presumptive request, in accordance with the established custom, notwithstanding the demand of Mr. Wilson that the barge should be taken back to Hoboken to his own dock a half mile above the dock from which she was cut loose; especially, also, considering the fact that by

complying with his request they would have remitted all legal proceedings for the enforcement of their claims to another jurisdiction, much less convenient to all concerned, and outside of the jurisdiction in which the salvage services had been rendered, and in which the average adjustment must be made. The moment the representative of the insurers appeared at the Erie basin, there was no further hesitation by the tugs as to their duty in the surrender of the property.

There is no evidence that the owners or the insurers will sustain any loss from taking the barge to the Erie basin instead of to the owners' dock at Hoboken. The bills making up the $781 referred to, are bills against the agents of the insurers, none of which are the owners liable to pay. If the owners had equal facilities for handling and rebaling cotton at Hoboken, it is not proved that these facilities were superior to those at the Erie basin, or that the owners would have done the work at any less cost to the insurers. It is not alleged that the expenses at the Erie basin were excessive; or that the insurers were dissatisfied with that destination. The mere loss of the job of handling the burnt cargo is not an element of legal damage.

Taking all the circumstances into account, $2,000 will, I think, be a suitable award for the whole salvage service, which sum I divide among the tugs engaged, as follows:

To the Ellen, $400; to the Johnson Brothers, $500; to the Golden Rod, $400; to the Daylight, $300; to the Howard, $225; and to the McCarty, $175; one third to go to the tug owners, and the remainder to the captain and crew in proportion to their wages; the captain, however, of each tug to take a double share.

A decree may be entered accordingly, with costs